IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMIE RAE STANLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 15-cv-1040-JPG-CJP |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM and ORDER**

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jamie Rae Stanley seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for benefits in August 2011, alleging disability beginning on August 12, 2011 (Tr. 13). After holding an evidentiary hearing, ALJ Roxanne L. Kelsey denied the application for benefits in a decision dated January 24, 2014 (Tr. 13-22). The Appeals Council denied review, and the decision of the ALJ became the final agency decision (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ failed to build a logical bridge between the evidence and her conclusions regarding plaintiff's musculoskeletal pain.

2. The ALJ failed to build a logical bridge between the evidence and her conclusions regarding plaintiff's asthma and COPD.

3. The ALJ failed to build a logical bridge between the evidence and her conclusions regarding plaintiff's depression and anxiety.

4. The ALJ failed to properly evaluate plaintiff's credibility.

5. The ALJ violated SSR 96-8p by failing to explain how she concluded that plaintiff could perform "the full range of light work."

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. Under this procedure, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Stanley was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a

3

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (collecting cases).

### The Decision of the ALJ

ALJ Kelsey followed the five-step analytical framework described above. She found that plaintiff was insured for DIB through June 30, 2013.[2] She determined that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.

A prior application for benefits had been denied as of August 11, 2011, the day before the current alleged date of disability.

The ALJ found that plaintiff had severe impairments of depression, panic disorder without agoraphobia, COPD, asthma and degenerative disc disease. She further determined that those impairments did not meet or equal a listed impairment.

The ALJ found that Ms. Stanley's allegations about her impairments and limitations were not "entirely credible." She determined that plaintiff had the RFC to perform work at the light exertional level with physical and mental limitations. She was unable to do her past relevant work. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the local and national economies.

---

[2] The date last insured is relevant only to the claim for DIB.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

    **1.    Agency Forms**

Plaintiff was born in 1961, and was almost 50 years old on the alleged onset date of August 12, 2011. A prior claim for social security disability benefits had been denied on August 11, 2011 (Tr. 223). She had past work as a teacher, an office clerical worker, a hotel desk clerk and a barber (Tr. 205).

Ms. Stanley submitted a Function Report in September 2011 stating that she did very little throughout the day. She said she had a "hard time breathing" and used a nebulizer machine every three to four hours. Standing or sitting for more than ten to fifteen minutes caused back pain. She shopped for food, but had to rest while in the store or use a motorized cart. She made simple meals such as sandwiches, frozen dinners or salad. She could do laundry but had to sit while folding clothes. She had panic and anxiety attacks (Tr. 225-236).

In March 2012, plaintiff reported that her COPD, depression and panic attacks had "progressed." Her mother made her meals and did her laundry (Tr. 256-267).

    **2.    Evidentiary Hearing**

Ms. Stanley was represented by an attorney at the evidentiary hearing on October 18, 2013 (Tr. 32).

Plaintiff testified that she lived with her husband. He was disabled, but he did most of the household chores[3] (Tr. 35).

---

[3] Plaintiff apparently got married during the pendency of her application.

5

It was sometimes hard for her to be around people because she had panic and anxiety attacks. She also had trouble concentrating (Tr. 38). She had stopped smoking two months before the hearing. She used a nebulizer about every three hours. She also used three different inhalers. The medication sometimes did not help her breathing and she had to go to the emergency room (Tr. 40-41).

Plaintiff had pain in her low back, hips and shoulder blades. She lay in bed with her feet up to relieve the pain. She was able to sit for ten to fifteen minutes. She could stand for five or ten minutes and could walk for about a block (Tr. 42).

Ms. Stanley did not have insurance, which limited her ability to get health care. She saw a counselor at Family Counseling but was limited to only ten hours in a year because she did not have a medical card. The psychiatrist at Family Counseling cost $75.00, and she could not afford it (Tr. 44-45).

A vocational expert (VE) also testified. The ALJ asked a hypothetical question which corresponded to the ultimate RFC findings, *i.e.*, a person of plaintiff's age and work experience who could do work at the light exertional level, limited to occasional climbing, no more than occasional concentrated exposure to extreme temperatures or humidity, and no more than occasional exposure to concentrated levels of dust, fumes or gasses. She lacked ability to understand, remember and carry out detailed instructions, but retained the concentration necessary for simple work of a routine and repetitive type. She was limited to only occasional work in coordination with or proximity to others and only occasional brief and superficial contact with the general public. The VE testified that this person could not do plaintiff's past work but would be able to do jobs which exist in the local economy such as hand packer, assembler and sorter (Tr. 52-53).

### 3.   Medical Treatment

As the ALJ noted, plaintiff's previous application was denied on August 11, 2011, and that finding stands as a determination that she was not disabled as of that date.   Many of the medical records predate August 11, 2011, and therefore are of limited relevance.

Plaintiff suffered two injuries to her back in 2010 (Tr. 454).   In March 2011, Dr. Matthew Gornet performed a laminectomy at L3-4 and insertion of a spinous distractor at the same level (Tr. 445-446).   Dr. Gornet noted that she did well following surgery (Tr. 439, 443).

On August 8, 2011, Dr. Gornet noted that plaintiff continued to do well, and he released her to return to work with no restrictions (Tr. 1157).   In September 2011, Dr. Gornet stated that her "result has been excellent to date."   She did have some limitations with "prolonged activity such as leaning forward, bending, etc." (Tr. 1156).

Plaintiff was treated in 2011 for asthma and shortness of breath by Dr. Sujay Bangarulingam, a pulmonologist.   In May 2011, he noted that she had some shortness of breath with activity which was "promptly relieved with Albuterol inhalers" (Tr. 627).

Plaintiff was hospitalized from August 18 to August 24, 2011, because of an acute asthma exacerbation.   She was treated with nebulizers, steroids and oxygen.   She stated that she had stopped smoking about a year earlier (Tr. 631-634).

Ms. Stanley was seen by Dr. Kimberly Whitaker at Frances Nelson Health Center on August 26, 2011, for hospital follow-up and anxiety.   She had continued to have chest pain since her discharge, but on exam her lungs were clear to auscultation and respiratory effort was normal. She complained of anxiety.   She had been out of Cymbalta for a few weeks.   Dr. Whitaker recommended that she follow up with her pulmonologist.   She was to continue taking Trazodone and Cymbalta and to start low dose Clonazepam for panic attacks (Tr. 1190-1193).   In October

2011, Dr. Whitaker noted that plaintiff had been seen by a pulmonologist, and her asthma medications had been changed. She was supposed to take Zyflo instead of Singulair, but she had been unable to afford Zyflo. The Clonazepam helped with panic attacks for the first three weeks, but she was getting very tired in the afternoon. She reported normal memory, concentration and appetite. Dr. Whitaker changed her medications per the pulmonologist's recommendations and referred plaintiff to a "medicine program" for assistance in getting Zyflo. She also recommended that plaintiff take two Clonazepam tablets in the morning. She noted that plaintiff's back pain was "well controlled" following surgery and that she was taking Naproxen, Flexeril and Tramadol (Tr. 1194-1106).

On October 17, 2011, William Kohen, Psy.D., performed a consultative psychological examination at the request of the agency. He diagnosed Ms. Stanley with major depressive disorder and panic disorder without agoraphobia. He concluded that she had "adequate memory, comprehension, ability to sustain concentration, and social interaction skills," but that her "persistence and adaptability are impaired by her psychiatric issues and physical problems with related pain and other complications" (Tr. 1198-1202).

On October 22, 2011, Afiz Talwo, M.D., performed a consultative physical examination at the request of the agency. Spirometry studies showed FEV1 of 1.54, 1.67 and 1.16. On exam, her lungs had increased AP diameter with bilateral wheezes. He found that she had a full range of motion of the lumbar spine and that straight leg raising was negative. She walked without a limp and was able to perform toe/heel walk. Sensory examination was normal. He diagnosed COPD/asthma and chronic low back pain (Tr. 1208-1212).

Dr. Bangarulingam saw plaintiff again in December 2011. Although she denied that she was smoking again to the doctor, she admitted to the lab technician that she had started smoking

again about a month and a half earlier. Pulmonary function testing showed a severe airway obstruction with significant improvement after administration of a bronchodilator. Her FEV1 was .94 pre-bronchodilator and 1.51 post- bronchodilator. The doctor diagnosed severe persistent asthma, bronchiectasis, dyspnea and active smoking[4] (Tr. 1291-1292, 1296).

      Plaintiff was seen by doctors at Frances Nelson Health Center six times during 2012 for treatment of her asthma, osteoarthritis and depression/anxiety. Physical and mental exams were essentially normal (Tr. 1307-1336). In February 2012, she had a normal range of motion, normal muscle strength and normal gait. Straight leg raising was negative. She was oriented and had normal insight and judgment, as well as appropriate mood and affect (Tr. 1312). In May 2012, the doctor noted that she was smoking again (Tr. 1314). She complained of back pain, but physical exam was normal. She was out of Diclofenac, which the doctor thought might be causing her problems. She was to talk to "Cindy" about a prescription assistance program (Tr. 1314-1315). In August 2012, her spine was not tender to palpation but she had a mildly reduced range of motion (Tr. 1320). In September 2012, her depression was under "poor control." She was under a lot of stress with family and friends and had not been able to find work. She had not been taking Abilify. She was oriented and had normal insight and judgment, as well as appropriate mood and affect (Tr. 1322-1325). She was still smoking in December 2012. Her lungs were clear to auscultation and respiratory effort was normal. The review of systems was negative for anxiety and depression. She was oriented and had normal insight and judgment, as well as appropriate mood and affect (Tr. 1330-1333).

      Plaintiff saw Dr. Nelson Wong at Community Health and Emergency Services for an

---

[4] "Bronchiectasis is a chronic condition where the walls of the bronchi are thickened from inflammation and infection. People with bronchiectasis have periodic flare-ups of breathing difficulties called exacerbations." http://www.lung.org/lung-health-and-diseases/lung-disease-lookup/bronchiectasis/, visited on November 16, 2016.

exacerbation of her COPD in April 2013. He noted moderate bilateral wheezing on auscultation. He administered a steroid and indicated he would consider a steroid pack the following week if she did not improve. He also counseled her on quitting smoking (Tr. 1356-1358). When she returned in about five weeks, her COPD was "overall doing well." She complained of depressed mood, and difficulty concentrating and falling asleep. She had been out of her medications for about three weeks. Her lungs were clear to auscultation. She was oriented and demonstrated an appropriate mood and affect (Tr. 1352-1355). In June 2013, she complained of low back pain for about a week. She also indicated that she was sometimes not able to get her medications. On exam, she had tenderness of the lumbar spine and mild pain with motion. Dr. Wong prescribed Ultram and advised her to use a heating pad (Tr. 1348-1351). The next visit was in July 2013. There was no notation of back pain. She complained of a depressed mood. She had been unable to afford Cymbalta (Tr. 1344-1347). In October 2013, plaintiff complained of anxious, fearful thoughts, depressed mood, difficulty falling asleep, excessive worry, and racing thoughts. There was no mention of back pain. Physical exam was normal except for wheezing. Dr. Wong counselled her on tobacco cessation, and instructed her to increase her dosage of Celexa (Tr. 1339-1341).

## Analysis

All of plaintiff's arguments rest, to some degree, on the credibility of her own subjective complaints. Therefore, the Court first turns to plaintiff's challenge to the ALJ's credibility determination.

Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the

objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005), and cases cited therein. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996), *superseded by* SSR 16-3p (effective Mar. 28, 2016). "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for her credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record").

As plaintiff points out, ALJ Kelsey expressed her credibility findings in the boilerplate language that was criticized in cases such as *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and *Minnick v. Colvin,* 775 F.3d 929, 936 (7th Cir. 2015). However, the use of the boilerplate language does not automatically require reversal. It is harmless where the ALJ goes on to support her conclusion with reasons derived from the evidence. *See Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012); *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014). ALJ Kelsey failed to do so here.

11

The ALJ did not give much explanation for her adverse credibility determination. Much of her decision consists simply of a review of the medical evidence. However, she did note "compliance issues," the fact that plaintiff continued to smoke, and her daily activities.

As was noted in the Court's review of the evidence, the medical records document that Ms. Stanley had no insurance coverage and had difficulty obtaining her medications because of the cost. At Tr. 19, the ALJ noted "mention of compliance issues," followed by a reference to plaintiff's stopping medications when she is not able to get them. The ALJ apparently considered this to detract from her credibility. However, an ALJ may not conclude that a claimant is exaggerating her pain and limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment. *Garcia v. Colvin*, 741 F.3d 758, 761-62 (7th Cir. 2013), *citing* SSR 96-7p, 1996 WL 374186, at *7-8. ALJ Kelsey seems to have concluded that plaintiff was exaggerating her symptoms because she did not always take her medication without grappling with the fact that plaintiff, with no income and no insurance coverage, could not always afford to fill her prescriptions.

The issue of plaintiff's smoking cuts both ways. The ALJ noted that plaintiff's doctors counselled her to stop smoking. She stated that plaintiff's "resistance to follow recommended medical advice could cause speculation of the severity of the claimant's symptoms." She also noted that Ms. Stanley testified at the hearing in October 2013 that she had quit smoking several months earlier with no relapse, but medical records dated October 13, 2013, indicated that she was still smoking (Tr. 19).

It was not necessarily error for the ALJ to rely on Ms. Stanley's apparent untruth at the hearing about when she stopped smoking. *See Clemons v. Barnhart*, 148 F. App'x 541, 543 (7th Cir. 2005) (holding that it was not error for the ALJ to discount plaintiff's credibility because she

12

"misled an evaluating physician about her smoking habit").  However, it is worth noting that the ALJ did not confront plaintiff with the apparent contradiction at the hearing and ask for an explanation.  Further, the medical records from October 13, 2013, do not, as the ALJ stated, actually say that plaintiff continued to smoke at that time.  Rather, Dr. Wong noted that "tobacco cessation was discussed," and he provided "tobacco cessation counselling" (Tr. 1339, 1341).  These notes are ambiguous; Dr. Wong may have meant that she was still smoking and he counselled her to quit, or he may have meant that she had already quit smoking and he counselled her in support of her continued abstention from tobacco use.

More problematic is the ALJ's conclusion that plaintiff's continued smoking called into question the severity of her symptoms.  The Seventh Circuit has held that this is an unreliable basis for an adverse credibility determination:

> We note that even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful.  Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health.  One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop.  This is an unreliable basis on which to rest a credibility determination.

*Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).

The ALJ also relied on plaintiff's activities of daily living, noting that she was able to repot plants, make laminated magnets, watch television, attend church, drive, handle financial transactions, travel independently, and socialize with family and friends daily (Tr. 20).  The ALJ cited to Ex. 10E for these last six items.  This exhibit is a Function Report submitted by plaintiff in March 2012 (Tr. 259-267).  The ability to "handle financial transactions" apparently refers to

13

plaintiff's admission that she was able to pay bills, count change, and handle savings and checking accounts (Tr. 262). The ability to "travel independently" apparently refers to plaintiff's admitted ability to leave her house alone (Tr. 262). And the ability to socialize with family and friends refers to plaintiff's admission that she talked on the phone or used a computer. She also stated that she did not get out as much as she did before and did not "spend time with friends and family doing things and having fun" (Tr. 253-264). The first two activities, repotting plants and making laminated magnets, were testified to by plaintiff at the hearing. However, the ALJ asked no follow-up questions about the frequency of these activities or the physical and mental demands required by them (Tr. 36-37).

While an ALJ may certainly consider a claimant's daily activities, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

The Commissioner's brief does not attempt to defend the ALJ's reliance on plaintiff's failure to always take her medication without considering her inability to afford her prescriptions, or on her conclusion that plaintiff's failure to quit smoking called into question the severity of her symptoms. She does, however, argue that the ALJ did not impermissibly equate plaintiff's daily living activities with an ability to work full-time. *See* Doc. 28, p. 9.

Because the ALJ gave little explanation for her adverse credibility determination, it is difficult to say with any certainty exactly how the ALJ viewed the significance of plaintiff's daily living activities. She discussed some activities (repotting plants, making magnets, watching television, attending church, etc.) at Tr. 20 in connection with plaintiff's ability to concentrate and pay attention. However, those activities are not particularly indicative of a good ability to concentrate and pay attention. *See, e.g., Taylor v. Colvin*, 829 F.3d 799, 801 (7th Cir. 2016) (citing *Voigt v. Colvin*, 781 F.3d 871, 878-79 (7th Cir. 2015) (expressing doubt that the ability to

play videogames indicates concentration sufficient for full-time work)).

In any event, the Seventh Circuit has clearly held that an ALJ may not use the performance of daily living activities "as a basis to determine that [plaintiff's] claims of a disabling condition were not credible" without acknowledging the differences between the demands of full-time work and the performance of such activities. *Ghiselli v. Colvin*, 837 F.3d 771, 777-78 (7th Cir. 2016). There is no indication that the ALJ here appreciated such differences. This was error. *See Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016).

This case is remarkably similar to *Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014), in which the credibility determination was held to be erroneous where the ALJ relied heavily on the absence of objective support for plaintiff's claim while ignoring her lack of health insurance and misstated some of the evidence. *See also Morgan v. Astrue*, 393 F. App'x 371, 375 (7th Cir. 2010) (holding that a credibility determination based on "unsound reasoning" is erroneous).

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce,* 739 F.3d at 1051. Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

It is not necessary to address plaintiff's other points, but, as in *Pierce*, the determination of plaintiff's RFC will require "a fresh look" after reconsideration of Ms. Stanley's credibility. *Id*. However, to the extent that plaintiff argues that her impairments met or equaled a listed impairment, she is incorrect.

A finding that a claimant's condition meets or equals a listed impairment is a finding that

15

the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis," 20 C.F.R. § 404.1525(d). The claimant bears the burden of proving that she meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Plaintiff suggests that she meets Listing 1.04 (Disorders of the Spine). One of the criteria of the listing is positive straight leg raising test, sitting and supine. 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04. Plaintiff argues that she had positive straight leg raising tests on five exams, and was unable to do the test because of pain on a sixth, but all of these instances predated the denial of her prior claim on August 11, 2011. *See* Doc. 17, p. 8. The denial of her prior application "stands as the final decision on her disability through the date of the decision." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citing 20 C.F.R. § 404.988). In addition, all of those instances predated her back surgery. Plaintiff has failed to show that the ALJ's determination that she did not meet Listing 1.04 was erroneous.

She also suggests that she met Listing 3.02 (Chronic Pulmonary Insufficiency) because some of her scores on spirometry testing were "slightly above the score required to be disabling." *See* Doc. 17, p. 12. By her own admission, her scores did not meet the requirements of the listing; therefore, her breathing problems are not presumptively disabling. 20 C.F.R. § 404.1525(d). Further, the "highest values of the FEV1 and FCV, whether from the same or different tracings, should be used to assess the severity of the respiratory impairment." 20 C.F.R. Part 404, Subpt. P, App. 1, § 3.00E. Plaintiff's highest scores were well above the presumptively disabling score specified in Listing 3.02 – 1.35 (Tr. 16).

While the ALJ did not err in finding that plaintiff's impairments did not meet or equal a

listed impairment, her RFC determination will have to be reconsidered on remand in light of the reconsidered credibility determination.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Stanley is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Jamie Rae Stanley's application for social security Disability Insurance Benefits and Supplemental Security Income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:   November 22, 2016

                                                s/ J. Phil Gilbert
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**